+UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN TILCHEN<br><br>Plaintiff,<br><br>v.<br><br>CEMD ELEVATOR CORP. d/b/a CITY ELEVATOR, MITCHELL HELLMAN, STEPHA DIEMER, CARL ALONGIS and KONE, INC.,<br><br>Defendants | Case No. 17-CV-00051 (PAC) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT TO DISMISS THE TORTIOUS INTERFERENCE <u>COUNTERCLAIM</u>**

Law Office of Ethan A. Brecher, LLC
600 Third Avenue, 2nd Floor
New York, NY 10016
Phone: (646) 571-2440
Fax: (888) 821-0246

*Attorney for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................... 2

ARGUMENT .............................................................................................................. 5

   I.    SUMMARY JUDGMENT STANDARD ............................................................ 5

   II.    DEFENDANTS ARE NOT IN PRIVITY WITH THE CONTRACTS WITH WHICH THEY CLAIM PLAINTIFF INTERFERED, AND THUS THEY HAVE NO STANDING TO BRING A CLAIM FOR TORTIOUS INTERFERENCE .......................................................... 6

   III.    DEFENDANTS CANNOT SHOW "BUT FOR" CAUSATION FOR ANYTHING TILCHEN SAID OR DID AND ANY CUSTOMER'S ALLEGED BREACH OF CONTRACT ............................................................................................................ 10

   IV.    DEFENDANTS CANNOT ESTABLISH THAT TILCHEN EMPLOYED "WRONGFUL MEANS" TO CAUSE ANY OF THE ALLEGED BREACHES ................... 12

   V.    TILCHEN WAS PERMITTED TO SOLICIT THE CUSTOMERS' BUSINESS AND DID NOT TORTIOUSLY INTERFERE WITH THOSE CONTRACTS BECAUSE HE DID NOTHING THAT EXCEEDED A "MINIMUM LEVEL OF ETHICAL BEHAVIOR IN THE MARKETPLACE" .............................................................................................. 14

   VI.    DEFENDANTS HAVE FAILED TO DEMONSTRATE ANY MATERIAL ISSUES OF FACT REGARDING A COGNIZABLE CLAIM FOR COMPENSATORY OR PUNITIVE DAMAGES ........................................................................................... 15

CONCLUSION......................................................................................................................... 18

## TABLE OF AUTHORITIES

**Cases**

*Artwear, Inc. v. Hughes*, 202 A.D.2d 76 (1st Dep't 1994) ............................................................. 7

*Conte v. Emmons*, 895 F.3d 168 (2d Cir. 2018) .............................................................. 7, 12, 13

*Daniels v. Brooklyn Estates & Properties Realty*, 413 Fed Appx 399 (2d Cir. 2011) ................... 6

*Debary v Harrah's Operating Co., Inc.*, 465 F. Supp. 2d 250 (S.D.N.Y. 2006), *affd sub*

  *nom. Catskill Dev., L.L.C. v Park Place Entertainment Corp.*, 547 F.3d 115 (2d Cir. 2008).... 8

*Del Norte v. WorldBusiness Capital, Inc*, 2017 WL 4334005 (S.D.N.Y., Apr. 5, 2017)............. 10

*Dime Laundry Serv., Inc. v 230 Apartments Corp.*, 120 Misc. 2d 399 (N.Y. Cty. Sup. Ct. 1983)

  ..................................................................................................................................... 15

*Dormitory Auth. v Samson Constr. Co.*, 30 N.Y.3d 704 (2018)..................................................... 9

*Guard-Life Corp. v. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183 (1980)........................... 13, 14

*Healthcare I.Q., LLC v. Tsai Chung Chao*, 118 A.D.3d 98 (1st Dep't 2014).............................. 15

*Intl. Minerals and Resources, S.A. v Pappas*, 96 F.3d 586 (2d Cir. 1996)............................ 17, 18

*M'Baye v. World Boxing Ass'n*, 2009 WL 2245105 (S.D.N.Y., July 28, 2009).......................... 16

*Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48 (1st Dep't 2015).... 18, 19

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614 (1996) ........................ 13, 14

*Silverman v. Attilio Giusti Leombruni S.P.A.*, 2018 WL 4335507 (S.D.N.Y., Sept. 11, 2018) ..... 6

*V. Marangi Carting Corp. v. Judex Enterprises, Inc.*, 171 Misc. 2d 820 (N.Y. Cty. Sup. Ct. 1997)

  ..................................................................................................................................... 16

*Veleron Holding, B.V. v. BNP Paribas SA*, 2014 WL 12699263 (S.D.N.Y., Apr. 16, 2014) ........ 9

*Wells Fargo Bank Northwest, N.A. v Energy Ammonia Transp. Corp.*, 2002 WL 1343757

  (S.D.N.Y., June 18, 2002)............................................................................................................. 7

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422 (2007) .............................. 16

**Statutes**

N.Y. Gen. Oblig. Law § 5-903(2). ........................................................................... 15, 16

**Rules**

Fed. R. Civ. P. 56. ................................................................................................................. 8

**PRELIMINARY STATEMENT**

Plaintiff Steven Tilchen ("Tilchen") submits this Memorandum of Law in support of his Rule 56 motion for summary judgment dismissing Defendants' claim for tortious interference with contract that they asserted against him. Tilchen is a former CEMD Elevator Corp. ("CEMD") salesman who joined KONE Inc. ("KONE") after KONE acquired CEMD's assets during the summer of 2016 pursuant to an Asset Purchase Agreement ("APA") and accompanying documents.  Tilchen left KONE in January 2017 to join a competing start-up firm that never started its operations. CEMD claims that Tilchen tortiously interfered with the contracts it sold to KONE and seeks damages based on an adjustment to the purchase price based on the APA's provisions for reducing the price in the event that one or more of the customers cancelled their contracts with KONE.

Defendants' claim should be dismissed for a number of reasons, including (1) Defendants are not in privity with and/or are not intended third-party beneficiaries of the allegedly breached contracts and thus lack standing to sue for tortious interference; (2) Defendants cannot establish any material triable issues of fact showing that anything Tilchen said or did was the "but for" reason the customers cancelled their contracts with KONE; (3) Defendants cannot establish any material triable issues of fact showing that Tilchen used "wrongful means" to induce the breach of any contract between a customer and KONE; (4) Defendants cannot establish any material triable issues of fact showing that Tilchen's conduct exceeded "a minimum level of ethical behavior in the marketplace" so as to subject himself to liability for tortious interference; and (5) Defendants cannot establish any material triable issues of fact showing that they have any cognizable compensatory damages or right to punitive under New York's law for tortious interference.

1

In short, Defendants have failed in all respects to establish the existence of triable issues of material fact on the key elements of their claim for tortious interference and it should therefore be dismissed.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Starting in 2003 Tilchen began working for CEMD as a salesman selling elevator maintenance, repair, and modernization services. (Statement of Undisputed Material Facts "SUMF" at ¶ 1). Tilchen was employed by CEMD until September 1, 2016, after which he became a KONE employee following the sale of CEMD's assets to KONE.  Tilchen resigned from KONE on January 9, 2017 and subsequently became an employee of Keystone Iron & Wire Works, Inc. ("Keystone"). (SUMF at ¶¶ 8-11).

CEMD and KONE entered into an Asset Purchase Agreement on July 28, 2016 (the "APA").  (SUMF at ¶ 2). Defendants Mitchell Hellman ("Hellman") and Stephan Diemer ("Diemer") executed the APA on behalf of CEMD and John R. Lynly executed the APA on behalf of KONE.  (SUMF at ¶ 3). KONE purchased CEMD's Assumed Maintenance Contracts per Revised Schedule 1.01(a) and 1.01(b) of the APA, which amounted to 276 contracts between CEMD and its consumers. (SUMF at ¶ 4).  KONE also purchased CEMD's WIP Contracts as per Revised Schedule 1.01(f) of the APA, which amounted to 8 contracts between CEMD and its consumers. (SUMF at ¶ 5).  Pursuant to the Assignment and Assumption Agreement executed on August 31, 2016, CEMD conveyed, transferred, and assigned to KONE all of CEMD's "rights and interests to the Assumed Maintenance Contracts and WIP Contracts." (SUMF at ¶ 6).

The APA contains a provision regarding a reduction in the purchase price for KONE's purchase of CEMD's assets. The parties agreed that the purchase price was subject to reduction for "lost revenue as a result of the termination of the Assumed Maintenance Contracts, provided

that the termination of the Assumed Maintenance Contracts or lost revenue is not the result of any act or omission or [SIC] the Buyer [KONE]." This purchase price reduction provision applied to contracts terminated in "the first year following the closing date." The closing date of the APA was September 1, 2016. (SUMF at ¶ 7).

After Tilchen resigned from KONE, he became an employee of Keystone in late January of 2017. (SUMF at ¶¶ 10-11).  Keystone drafted maintenance contracts with sixteen former KONE consumers. (SUMF at ¶ 12). Contracts with fifteen of the sixteen former KONE consumers were fully executed.  (SUMF at ¶ 13). All of the addresses of the customers that Keystone contracted with were listed in the APA's Revised Schedules 1.01(a) or 1.01(b) of Assumed Maintenance Contracts. (SUMF at ¶ 15).

CEMD produced thirteen contracts with the consumers who subsequently negotiated agreements with Keystone. (SUMF at ¶ 16).   CEMD did not produce CEMD contracts predating KONE's purchase of CEMD assets for three former KONE customers who went on to become Keystone customers. (SUMF at ¶ 17).   Additionally, three of the contracts CEMD produced were not executed by the consumer. (SUMF at ¶ 18).   Of the thirteen CEMD consumer contracts that it produced, four contained a five-year term, which expired after the dates of the contracts the consumers entered into with Keystone.  (SUMF at ¶ 19). After the expiration of the five-year term, the agreements between the parties could continue from "year to year thereafter unless terminated in writing by either party thirty (30) days prior to the end of any contract term."  (SUMF at ¶ 19).  The remaining contracts were either: (1) past the five-year term and were terminable at will from year-to-year, (2) a month-to-month contract, (3) or did not explicitly contain a term. (SUMF at ¶¶ 20-28).

On February 12, 2018, CEMD and KONE executed Amendment No. 1 to the Asset Purchase Agreement (the "Amendment"). (SUMF at ¶ 29). Annexed to the Amendment were exhibits. Exhibit 5 to the Amendment is a list of former CEMD contracts contained on Revised Schedule 1.01(a) which were cancelled. (SUMF at ¶ 30).   A total of 150 contracts were cancelled. (SUMF at ¶ 30). Exhibit 6 to the Amendment is a list of former CEMD contracts contained on the APA's Revised Schedule 1.01(b) which were cancelled. (SUMF at ¶ 31).   A total of 12 of these contracts were cancelled. (SUMF at ¶ 31).  Project Renewal, one of the owners of a maintenance contract entered into by Keystone and a former KONE customer, was not listed either cancellation list.  (SUMF at ¶ 32).

CEMD's principal Hellman prepared a list of consumers who had contracts with CEMD, which according to Hellman were all subsequently assigned to KONE (the "Hellman List"). (SUMF at ¶ 33). Hellman also testified that he believed that Tilchen interfered with the contracts on the Hellman List. (SUMF at ¶ 36).   One of the contracts on the Hellman List, identified as 119 Chambers Street, was not listed on either the APA's Revised Schedule 1.01(a) or Revised Schedule 1.01(b) nor either of the cancellation lists. (SUMF at ¶ 34). In KONE's Answers to Plaintiff's Second Set of Interrogatories, KONE admitted that all of the contracts identified on the Hellman List were cancelled "with the exception of the contract for 119 Chambers Street, which address KONE was not able to find any record of a contract or cancellation."  (SUMF at ¶ 34).

The remaining contracts on the Hellman List do appear in Revised Schedule 1.01(a) and Revised Schedule 1.01(b) and were thus assigned to KONE. (SUMF at ¶ 35). The remaining contracts on the Hellman List appear in the cancellation lists attached to the Amendment, which

with the exception of a few addresses Tilchen recalls being associated with the "Miller & Miller Account" as included on the Hellman List.  (SUMF at ¶ 37).

Hellman does not have any firsthand knowledge of Tilchen speaking to any customer identified on the Hellman List. (SUMF at ¶ 38).   Hellman did not recall any specific comments Tilchen made to any of the customers identified on the Hellman List. (SUMF at ¶ 39).  Diemer, another CEMD principal, does not have any firsthand knowledge of Tilchen speaking to any customer identified on the Hellman List. (SUMF at ¶ 40). Diemer spoke with representatives from the Miller & Miller Account, as included on the Hellman List. (SUMF at ¶ 41). The representatives from Miller & Miller told Diemer that Tilchen met with them in order to "get the contract." The representatives from Miller & Miller told Diemer that Tilchen "submitted some sort of contracts" for the Miller & Miller buildings. (SUMF at ¶ 42).   Diemer did not recall speaking without anyone else on the Hellman List who mentioned Tilchen.  (SUMF at ¶ 43). Diemer did speak with a customer regarding Tilchen who was not identified on the Hellman List who told Diemer that they spoke with Tilchen and the sum and substance of their conversation was the "same concept" at the conversation with the Miller & Miller.  (SUMF at ¶ 44).

ARGUMENT

## I.     SUMMARY JUDGMENT STANDARD

As this Court held recently in granting a motion for summary judgment dismissing a tortious interference claim,

> Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But [w]here the record taken as a whole could

5

> not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Thus, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Silverman v. Attilio Giusti Leombruni S.P.A.*, 2018 WL 4335507, at *2 (S.D.N.Y., Sept. 11, 2018) (internal quotations marks omitted).  A party must introduce admissible evidence and not hearsay to oppose a summary judgment motion. *See Daniels v. Brooklyn Estates & Properties Realty*, 413 Fed Appx 399, 401 (2d Cir. 2011).

In this case, there are no genuine issues of material fact such that a reasonable jury could return a verdict for Defendants on their sole tortious interference claim and accordingly that claim should be dismissed pursuant to Fed. R. Civ. P. 56.

## II.      DEFENDANTS ARE NOT IN PRIVITY WITH THE CONTRACTS WITH WHICH THEY CLAIM PLAINTIFF INTERFERED, AND THUS THEY HAVE NO STANDING TO BRING A CLAIM FOR TORTIOUS INTERFERENCE

Defendants lack standing to sue Plaintiff for tortious interference because they are not in privity with the contracts that were allegedly interfered with, nor were they intended third-party beneficiaries of those contracts.

"[T]he elements of a tortious interference with contract claim under New York law [are]: (i) the existence of a contract; (ii) defendants' knowledge of that contract; (iii) defendants' intentional inducement of a breach of that contract; (iv) a breach; (v) but for the defendants' actions, that contract would not have been breached; and (vi) damages." *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018).

Importantly, the party asserting tortious interference must be in privity with the contract that is alleged to have been interfered with.  Unless a party is in privity of contract or is an

6

intended third-party beneficiary of the contract that is alleged to have been breached, it may not maintain a claim for tortious interference with contract. *See Artwear, Inc. v. Hughes*, 202 A.D.2d 76, 86 (1st Dep't 1994) ("There exists * * * no tort liability to incidental beneficiaries not in privity") (*citing Alvord & Swift v. Muller Constr. Co.,* 46 N.Y.2d 276 (1978)). *See also Wells Fargo Bank Northwest, N.A. v Energy Ammonia Transp. Corp.*, 2002 WL 1343757, at *1 (S.D.N.Y., June 18, 2002) ("Since, moreover, the IMCP defendants are neither parties to, nor third-party beneficiaries of, the Bareboat Charter, they lack standing to bring a claim for tortious interference with that contract and their purported claim to that effect must likewise be dismissed."); *Debary v Harrah's Operating Co., Inc.*, 465 F. Supp. 2d 250, 263 (S.D.N.Y. 2006), *affd sub nom. Catskill Dev., L.L.C. v Park Place Entertainment Corp.*, 547 F.3d 115 (2d Cir. 2008)("Under New York law, in order to recover as a third-party beneficiary of a contract, a claimant must establish that the parties to the contract intended to confer a benefit on the third party.").

In this case, the universe of allegedly interfered with contracts was limited by Defendants in their pre-motion letter dated August 27, 2018 (DE 93)[1] to thirteen customer contracts between CEMD and its clients, which contracts were subsequently all assigned to KONE upon the closing of the APA on September 1, 2016. As to each of those thirteen customers, CEMD claims that Tilchen, while affiliated in 2017 with Keystone, executed contracts for elevator maintenance and

---

[1] In relevant part in its August 27 letter, CEMD states, "During the course of discovery, Plaintiff produced thirteen contracts, which he executed as a principal of, Keystone Iron & Wire Corp., a competing entity. These thirteen contracts were all with CEMD's customers who had ongoing contracts with CEMD. Although CEMD sold these contracts to KONE, Inc., CEMD remained a beneficiary of these service agreements with its customers because under the terms of the asset purchase agreement with KONE, Inc., any contract terminated within one year of the sale reduced the purchase price. As a result of Plaintiff's interference, the purchase price was subsequently reduced and CEMD suffered damages in the amount of $322,133.62."

that those thirteen clients cancelled their contracts with KONE in order to do business with Keystone.

In this case, as per the APA and Hellman's admission, all the contracts that Defendants claim that Tilchen interfered with were assigned in 2016 by CEMD to KONE prior to any breach.  Thus, at the time of the alleged breaches, CEMD was no longer a party to, and no longer in privity with, the contracts at issue.  After the APA was executed and the contracts assigned by CEMD to KONE, the parties to the contracts that are the subject of the alleged interference were KONE and KONE's customers.  As such, CEMD as of the date of the assignment was no longer in privity of contract with the contracts with which it claims Tilchen tortiously interfered, and thus it has no standing to sue for tortious interference.

Further, CEMD was not an intended third-party beneficiary to the allegedly breached contracts between KONE and the customers.  Under New York law,

> [A] third party may sue as a beneficiary on a contract made for [its] benefit. However, an intent to benefit the third party must be shown, and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts. We have previously sanctioned a third party's right to enforce a contract in two situations: when the third party is the only one who could recover for the breach of contract or when it is otherwise clear from the language of the contract that there was an intent to permit enforcement by the third party.

*Dormitory Auth. v Samson Constr. Co.*, 30 N.Y.3d 704, 710 (2018) (internal quotation marks omitted).[2]

---

[2] "Only the parties to a contract, or intended third-party beneficiaries, have standing to sue for breach of contract.  Under New York law, a third-party beneficiary claim will survive a motion to dismiss if the plaintiff alleges the following: "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [the plaintiff's] benefit, and (3) that the benefit to [the plaintiff] is sufficiently immediate to indicate the assumption by the contracting parties of a duty to compensate [the plaintiff] if the benefit is lost.  An agreement that confers only an incidental benefit on the plaintiff will not suffice.  While the obligation to the third-party beneficiary need not be explicitly stated, the parties' intention to benefit the third

Here, neither condition is met to confer intended third-party beneficiary status on CEMD in connection with the contracts that it assigned to KONE. Those contracts, while prior to the assignment were for CEMD's benefit, were no longer for its benefit after the assignment, nor is there any indication in those contracts or the APA that CEMD could pursue a claim for breach of those contracts. Further, KONE as the owner of the post-assignment contracts, was in a position to recover for breach of those contracts. Under these circumstances, CEMD was not an intended third-party beneficiary of those contracts, but post-assignment was at best an incidental beneficiary of the contracts and thus has no standing to sue for tortious interference.

> An incidental beneficiary is a third party who may derive benefit from the performance of a contract though he is neither the promisee nor the one to whom performance is to be rendered. A third party is an intended beneficiary where either (1) no one other than the third party can recover if the promisor breaches the contract or (2) the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party. If not mentioned as a party to the contract, the parties' intent to benefit the third party must be apparent from the face of the contract. Absent clear contractual language evincing such intent, New York courts have demonstrated a reluctance to interpret circumstances to construe such an intent.

*Del Norte v. WorldBusiness Capital, Inc*, 2017 WL 4334005, at *12 (S.D.N.Y., Apr. 5, 2017) (internal citations and quotations omitted).

Despite the black-letter law regarding third-party beneficiary status, CEMD's theory on its tortious interference claim is that following the assignment it "remained a beneficiary of these service agreements with its customers because under the terms of the asset purchase agreement

---

party must [nonetheless] appear from the four corners of the instrument. However, it is permissible for the court to look at the surrounding circumstances as well as ... the agreement. Still, **The terms contained in the contract must *clearly evince* an intention to benefit the third person who seeks the protection of the contractual provisions.**" *Veleron Holding, B.V. v. BNP Paribas SA*, 2014 WL 12699263, at *20 (S.D.N.Y., Apr. 16, 2014) (internal quotation marks and citations omitted) (emphasis added).

9

with KONE, Inc., any contract terminated within one year of the sale reduced the purchase price."[3] (DE 93).  Notably, under the APA and its accompanying Assignment CEMD conveyed, transferred and assigned to KONE  all rights in those contracts and further, there is nothing in the APA or the Assignment that provided that any rights under those contracts remained with CEMD.

Thus, CEMD has admitted that, at the time of the alleged breaches, it was no longer a party to the thirteen contracts at issue.  Instead, CEMD asserts that, at best, it was an indirect beneficiary of those contracts because under the APA its consideration from the sale would be reduced if certain contracts were terminated within a one-year period.  Thus, lacking privity of contract and not being an intended third-party beneficiary of the contracts in question, CEMD lacks standing to pursue a tortious interference claim against Tilchen and its sole counterclaim for tortious interference with contract should be dismissed.

## III.    DEFENDANTS CANNOT SHOW "BUT FOR" CAUSATION FOR ANYTHING TILCHEN SAID OR DID AND ANY CUSTOMER'S ALLEGED BREACH OF CONTRACT

Under New York law, for a plaintiff to recover on a tortious interference claim,

> he must have shown that ***but for*** the defendants' actions, the third party would not have breached. … *See, e.g.*, *Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., Inc.*, 299 A.D.2d 204, 204 (1st Dep't 2002 ("An essential element of such a claim is that the breach of contract would not have occurred but for the activities of the defendant.")

---

[3] In ¶ 37 of its sole Counterclaim for tortious interference, CEMD alleged, "Pursuant to the terms of the asset sale between CEMD and Kone, Inc., the purchase price for the assets would be reduced by the amount of 33.2 times the monthly billable rate for any service contracts terminated within the first year of the sale." (DE 64)

*Conte*, 895 F.3d at 173 (emphasis added).

Here, there is no admissible evidence allowing for a reasonable inference that any of KONE's contracting counterparties (i.e., the customers that used to be counterparties with CEMD pre-assignment under the APA) stopped performing under a contract because of anything Tilchen did or said. There is no deposition testimony from any of the counterparties to the contracts in question regarding why they cancelled their contracts with KONE. There is not a shred of proof in the record as to why the contracts were cancelled. In fact, Hellman and Diemer both testified that neither had any first-hand knowledge of why the customers cancelled the contracts with KONE. Similarly, there is no admissible evidence that that any of the customers in question stopped performing their contracts with KONE because of anything Tilchen said or did. The record is silent as to why they stopped performing.

CEMD and KONE clearly anticipated that not all the customers with contracts that CEMD assigned to KONE would continue doing business with KONE. CEMD assigned 276 contracts to KONE and 150 customers chose to cancel their contracts.  Yet, CEMD is suing Tilchen for allegedly interfering with just 13 contracts out of the 150 cancelled contracts (approximately 8% of the total).  CEMD has no evidence that anything Tilchen said or did caused any customer to cancel a contract with KONE.  Instead, Defendants are relying on sheer speculation and hearsay to support their claim, which is insufficient to defeat a summary judgment motion.

Absent direct admissible evidence showing "but for" causation, the Second Circuit has held that as a matter of law it is improper speculation to infer that a defendant's words or actions were the "but for" reason that anyone stopped performing under a contract.

> But to conclude with no direct evidence that third parties breached their contracts with Conte due to the acts of appellants—rather than for

11

business reasons or because of word spreading from the disgruntled individuals with whom Conte battled in the early stages of I Media—was not a permissible inference, but an improper speculation. In short, there was no evidence that anyone stopped performing under a specific contract because of anything said or done by appellants. And, to the extent the jurors relied on Conte's testimony about what Conte's contracting counterparties told him were the reasons for their breach, they relied improperly on hearsay testimony.

*Conte*, 895 F.3d at 174.

Accordingly, because there is no admissible evidence that Tilchen was the "but for" cause of the cancellation of the contracts, Defendants have failed to establish a necessary element of their tortious interference claim and it should therefore be dismissed.

## IV.   DEFENDANTS CANNOT ESTABLISH THAT TILCHEN EMPLOYED "WRONGFUL MEANS" TO CAUSE ANY OF THE ALLEGED BREACHES

Under New York law, where a contract is terminable at will, there is no liability in tort absent evidence of "wrongful means." wrongful.  *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614, 621 (1996).  In *Guard-Life Corp. v. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183 (1980), the New York Court of Appeals granted summary judgment dismissing a tortious interference with contract claim involving a contract that was to continue indefinitely subject to termination by either party on one year's notice in light of the absence of "wrongful means."  *Id* at 196 ("There was no proof tendered of any wrongful means persuasion and offer of better terms, yes; fraud, misrepresentation, threats, other wrongful conduct, no.").

Here, most of the contracts in question were either past their 5-year terms and subject only to an automatic year-to year renewal unless terminated on 30-days' notice; or were month to month; or had no term. Thus, like the contract in *Guard-Life*, these contracts were terminable at will and Defendants are required to show "wrongful means," which is defined as "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of

economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *NBT Bancorp Inc.*, 87 NY2d at 624. Defendants have no proof of "wrongful means." As Hellman testified, he had no first-hand knowledge of what, if anything, Tilchen told the customers who cancelled their contracts with KONE. The same is true of Diemer. Thus, Defendants cannot meet their standard of proof.

Further, to the extent that Defendants claim that the contracts were not terminable at will during the renewal period, this argument is barred by § 5-903(2) of the New York General Obligations Law, which provides:

> No provision of a contract for service, maintenance or repair to or for any real or personal property which states that the term of the contract shall be deemed renewed for a specified additional period unless the person receiving the service, maintenance or repair gives notice to the person furnishing such contract service, maintenance or repair of his intention to terminate the contract at the expiration of such term, shall be enforceable against the person receiving the service, maintenance or repair, unless the person furnishing the service, maintenance or repair, at least fifteen days and not more than thirty days previous to the time specified for serving such notice upon him, shall give to the person receiving the service, maintenance or repair written notice, served personally or by certified mail, calling the attention of that person to the existence of such provision in the contract.

N.Y. Gen. Oblig. Law § 5-903(2).

Here, because notice as required by § 5-903(2) was (to Tilchen knowledge and recollection) not given by CEMD prior to the expiration of the term to the customers, the contracts expired and were terminable at will at the conclusion of the initial term. *Dime Laundry Serv., Inc. v 230 Apartments Corp.*, 120 Misc. 2d 399, 403 (N.Y. Cty. Sup. Ct. 1983) ("Since notice required by the statute was not given, the "lease" expired at the end of its original term and is no longer in effect."); *Healthcare I.Q., LLC v. Tsai Chung Chao*, 118 A.D.3d 98, 105 (1st Dep't 2014) ("Since the renewal clause was not timely brought to Dr. Chao's attention, the

agreement did not automatically renew on February 1, 2010 (*see e.g. Protection Indus. Corp. v. DDB Needham Worldwide,* 306 A.D.2d 175, 763 N.Y.S.2d 546 [1st Dept.2003]. Dr. Chao had the right to cancel the agreement at any time thereafter.") As such, for those contracts beyond their 5-year terms, Defendants are required to show "wrongful means," for which there is no evidence.

## V.   TILCHEN WAS PERMITTED TO SOLICIT THE CUSTOMERS' BUSINESS AND DID NOT TORTIOUSLY INTERFERE WITH THOSE CONTRACTS BECAUSE HE DID NOTHING THAT EXCEEDED A "MINIMUM LEVEL OF ETHICAL BEHAVIOR IN THE MARKETPLACE"

Tilchen was entitled to solicit any of KONE's clients, regardless of whether they were under contracts that were terminable at will or not, without incurring liability for tortious interference, so long as his conduct in doing so did not exceed "a minimum level of ethical behavior in the marketplace." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 427 (2007):

> Finally, we note that protecting existing contractual relationships does not negate a competitor's right to solicit business, where liability is limited to *improper* inducement of a third party to breach its contract. Sending regular advertising and soliciting business in the normal course does not constitute inducement of breach of contract.  A competitor's ultimate liability will depend on a showing that the inducement exceeded "a minimum level of ethical behavior in the marketplace."

*Id.;See also V. Marangi Carting Corp. v. Judex Enterprises, Inc.*, 171 Misc. 2d 820, 824 (N.Y. Cty. Sup. Ct. 1997) ("demonstrating how an offer of better terms can cross the line into tortious interference with a particular contract by sweetening the deal with something extra in order to

induce the customer to breach its contract with its other provider.");[4] *M'Baye v. World Boxing Ass'n*, 2009 WL 2245105, at *10 (S.D.N.Y., July 28, 2009)(summary judgment motion granted as to tortious interference with contract claim where there was  "no evidence of unethical behavior").

In this case, there is no evidence whatsoever that Tilchen engaged in any kind of behavior that exceeded a "minimum level of ethical behavior in the marketplace" in connection with contracting on Keystone's behalf with the clients who had contracts with KONE.  Defendants have no idea what was discussed between Tilchen and the customers who cancelled their contracts with KONE and support their assertions of disparagement on inadmissible hearsay.  Thus, Defendants cannot show any issues of material fact that show that Tilchen engaged in *improper* tortious conduct.

## VI.   DEFENDANTS HAVE FAILED TO DEMONSTRATE ANY MATERIAL ISSUES OF FACT REGARDING A COGNIZABLE CLAIM FOR COMPENSATORY OR PUNITIVE DAMAGES

Defendants' argument for damages for tortious interference is that, pursuant to a formula that they negotiated on a bilateral basis with KONE in the APA, they received less consideration for the sale of their assets to KONE based on the cancellation of contracts by customers with KONE, and that Tilchen is liable to compensate it for that reduction for contracts he obtained for Keystone.

Under New York law, this is not a basis for recovery of damages on a tortious interference claim.  The damages on a tortious interference claim are "(a) the pecuniary loss of

---

[4] The Court of Appeals in *White Plains Coat & Apron Co., Inc.* cited to *V. Marangi Carting Corp.* in its footnote 14 as a case that helped define the issue of whether a party engaged in competition cross the line from "ethical behavior" to improper conduct.

the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." *Intl. Minerals and Resources, S.A. v Pappas*, 96 F.3d 586, 597 (2d Cir. 1996). "General damages are normally ... measured by the difference between the contract price and the value of the performance to be received. Consequential damages include recovery for lost profits, which must be proven with reasonable certainty. *Id* (internal citations and quotations omitted).

Here, Defendants are not relying on the value of the alleged breached contracts; instead they are relying a formula for damages based on a provision of the APA that provides that the "purchase price for the assets would be reduced by the amount of 33.2 times the monthly billable rate for any service contracts terminated within the first year of the sale." *See* footnote 4, above. That is, their claim for damages is untethered to the allegedly breached contracts and the amounts owed (if anything) under those contracts, but rather a negotiated formula.  This is not a cognizable basis to recover damages for tortious interference under New York law and thus because their claim for damages is not recognized by New York law, they have failed to establish a key element of their tortious interference claim and the claim should be dismissed.

Defendants claim for punitive damages should also be dismissed because there is no proof showing that Tilchen said or did anything that meets the high burden necessary to recover punitive damages. In fact, Defendants have no admissible evidence that Tilchen said or did anything in dealing with KONE's clients that would even remotely implicate conduct that would warrant punitive damages.  Under New York law, to recover punitive damages on a tortious interference claim, the party seeking them "must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of

similar conduct directed at the public generally." *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48, 57 (1st Dep't 2015) (sustaining tortious interference verdict but disallowing punitive damages).  Defendants cannot show that Tilchen's conduct "evince[d] [the] high degree of moral turpitude and demonstrate such wanton dishonesty as to imply a criminal indifference to civil obligations." *Id*.  In fact, they have no evidence whatsoever that anything he said or did was the "but for" cause of the alleged breached of KONE's contracts with the contracts its assumed under the APA, much less any more egregious behavior. In fact, they have proof regarding what Tilchen said to the clients or why the clients cancelled their contracts with KONE.  As such, the punitive damages claim should be dismissed as a matter of law.

**CONCLUSION**

For the forgoing reasons, Tilchen requests that the Court enter an order dismissing on summary judgment Defendants' claim for tortious interference against him, and for such other and further relief that the Court deems just and proper.

Dated: New York, New York
         February 5, 2019

Respectfully submitted,

/s/ Ethan A. Brecher
**ETHAN A. BRECHER (EB 3425)**
Law Office of Ethan A. Brecher, LLC
600 Third Avenue, 2nd Floor
New York, NY 10016
Phone: (646) 571-2440
Fax: (888) 821-0246
Email: ethan@ethanbrecherlaw.com

*Attorney for Plaintiff*

18